UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Cause No. 2:22-CR-055-PPS-APR |
| ) | |
| FABIAN WRIGHT, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

In June 2022, Defendant Fabian Wright was indicted on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). [DE 1.] Before the case was reassigned to me in April 2024 [DE 45], Wright moved to dismiss the charge, arguing that § 922(g)(1) violates the Second Amendment under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). [DE 36.] The Supreme Court in *Bruen* said nothing about the rights of convicted felons to possess firearms. So it should come as no surprise that Judge DeGuilio denied Wright's motion to dismiss. [DE 42.] More specifically, Judge DeGuilio relied on his prior opinion in *United States v. Rice*, 622 F. Supp. 3d 935 (N.D. Ind. 2023), to conclude that the statute "satisfies the *Bruen* test" and "is consistent with the history and tradition of firearm regulations in the United States," incorporating *Rice*'s more robust analysis by reference. *Id.* at 2, n.1.

Wright is back before the court taking a new tack: he now says the case needs to be dismissed because of "substantive due process" concerns. [DE 53.] More specifically, he argues that the government relied upon "racially tinged historical evidence, and

evidence rooted in racial animus" while opposing his prior motion to dismiss before Judge DeGuilio, and that the government's briefing "violates basic notions of due process and equal protection." *Id.* at 1. For the reasons explained below, Wright's motion lacks merit and will be denied.

## Discussion

Before getting into the substance, there is a procedural issue to address: whether Wright's motion is really a request to reconsider Judge DeGuilio's prior analysis on the motion to dismiss – in which case, it's barred by the law of the case doctrine. *See Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."). To evaluate this argument, let's take a step back and explore exactly what was at issue in the prior round of briefing before Judge DeGuilio that now forms the basis for the dispute before me.

Wright asserted that § 922(g)(1) was unconstitutional on its face and as applied to his case. [DE 42 at 1.] The Second Amendment states: "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court identified the "core" of the Second Amendment as: "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008). The Court made clear, though, that "the right secured by the Second Amendment is not unlimited." *Id.* at 626; *see id.* at 595. A

few years later, a plurality of the Court, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), repeated its assurances that *Heller* "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons[.]" *Id.* at 786 (quoting 554 U.S. at 626–27).

That led us to *Bruen*, which involved a New York law making it a crime to possess a firearm without a license, both inside and outside the home. A person could obtain a license for a firearm, but they had to demonstrate a specific need for self-defense. *Bruen*, 597 U.S. at 1. The Court held the Second Amendment protects an individual's right to carry a handgun for self-defense both in the home and outside of the home, and that New York's licensing plan violated the Constitution. *Id*. When evaluating whether a regulation on Second Amendment rights is constitutional, *Bruen* instructs the courts to use the following standard:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

In its opposition to Wright's prior motion to dismiss [DE 38], the government argued that the federal felon-in-possession statute remains constitutional under *Bruen*'s two-step framework. To do so, it cited various historical analogues to § 922(g)(1) drawn from English history, colonial times, and the nation's founding. *Id.* at 11–20. The two

3

principal analogues the government identified were pre-founding laws that barred firearm possession by those that legislatures deemed untrustworthy (*id.* at 11–17), and punishments for felons during the same time period (*id.* at 17–20). As part of its first argument, the government in a footnote cited to "[f]irearm regulations directed toward disarming Native Americans and Black people," noting that these restrictions "were pervasive" in the seventeenth and eighteenth centuries. *Id.* at 13 & n.2.

Wright, represented by highly experienced defense counsel, subsequently filed a reply brief, in which he specifically challenged the notion that "laws that prohibited enslaved people, or warring Indian tribes, or Catholics from possessing arms" were sufficient to meet the government's burden under *Bruen* to show § 922(g)(1) is consistent with the nation's history and tradition of firearm regulation. [DE 41 at 3.] It's plain as day that Wright understood the government was attempting to rely (at least in some small part) on firearm restrictions that prohibited enslaved persons and Native Americans from possessing guns. *Id.*

Frankly, it makes no sense that Wright would wait many months to raise this fundamental challenge to the government's case—*i.e.*, that the government has used "racially tinged historical evidence" in a manner that "violates basic notions of due process and equal protection"—rather than assert it directly as part-and-parcel of these parallel arguments in his reply brief. [*See* DE 53 at 1.] In context, it is clear that Wright's Fifth Amendment challenge to the indictment simply attempts to relitigate the same issues presented to Judge DeGuilio (*i.e.*, the adequacy of the government's evidence of

4

historical analogues to the federal felon-in-possession statute). Judge DeGuilio already considered Wright's arguments challenging the government's cited evidence and rejected them as unpersuasive, finding no reason to depart from his prior decision in *United States v. Rice*, 622 F. Supp. 3d 935 (N.D. Ind. 2023). Accordingly, these 'new' arguments are foreclosed by the law of the case doctrine. *See Tully v. Okeson*, 78 F.4th 377, 380–81 (7th Cir. 2023) ("The consistency provided by the rule protects parties from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action.").[1]

Even if I were persuaded to consider the substance of Wright's motion, it plainly lacks merit. While he suggests that the government's use of "racially tinged" evidence in briefing the second prong of *Bruen*'s analysis forms a basis for a due process or equal protection violation, there is no suggestion that the government in any sense whatsoever endorsed these colonial era laws or purposefully discriminated against Wright on the basis of his race. *See McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (defendant must demonstrate "existence of purposeful discrimination" to make out equal protection claim); *St. Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872, 885 (7th Cir. 1983) (Fifth Amendment proscribes discrimination "so unjustifiable as to be violative of due process"). There is also no suggestion that Judge DeGuilio specifically relied upon these

---

[1] What's more, Wright makes no attempt in his motion to explain why he could not have raised his arguments rooted in due process and equal protection as part of his reply brief in support of his initial motion to dismiss. The issue was obviously ripe at that point. He has also failed to file a reply addressing the government's argument for application of the law of the case doctrine, which substantially supports my conclusion that his 'new' claims are really just a thinly veiled attempt to relitigate Judge DeGuilio's prior denial of his motion to dismiss on *Bruen* grounds.

laws in denying Wright's motion to dismiss. In sum, Wright has not come close to meeting the high bar to demonstrate purposeful discrimination on the basis of his race or conduct so unjustifiable as to violate his right to due process under the law.

The nature of this dispute goes to the heart of what makes *Bruen* so challenging in practice. In no uncertain terms, the Supreme Court now requires the government to "affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. Relevant considerations include "English history dating from the late 1600s, along with *American colonial views* leading up to the founding." *Id.* at 20 (emphasis added). *See also United States v. Rahimi*, 602 U.S. \_\_, 144 S. Ct. 1889, 1899–1900 (2024) (further discussing and attempting to clarify Second Amendment historical test under *Bruen*).

To state the obvious, a number of English colonies later organized as States in the Union possessed agricultural economies. Those economies were fueled by slave labor well into the nineteenth century. English and early colonial laws reflected outright prejudice against slaves, Native Americans, and their descendants. You don't need a PhD in American history to know that these groups were not afforded equal rights under the law – including with respect to firearm possession. Historical laws prohibiting marginalized groups from possessing guns are racist. There's a reason they no longer exist. And they obviously do not form a basis to make policy in a country that long ago outlawed slavery and adopted constitutional protections against race-based discrimination.

Critically, the government did not suggest otherwise. Instead, it did precisely what *Bruen* requires. Without endorsing the substance of the cited laws, the government simply pointed out various historical restrictions on individuals possessing guns. Those restrictions are inherently untethered, both temporally and substantively, from the modern reality of living in this country. But, under *Bruen*, they are necessary to show that statesmen in the 1700s would approve of § 922(g)(1)'s prohibition on felons possessing guns. As the Supreme Court decided for the first time in 2022, that's how we determine the scope of individual rights protected by the Second Amendment. If an activity implicates Second Amendment rights (as Judge DeGuilio evidently determined was the case with respect to felons possessing guns),[2] we must look back to history that often bears little resemblance to modern life, in order to confirm that a close enough historical parallel exists to justify upholding a modern gun regulation.

*Bruen* makes history and tradition a focal point of Second Amendment analysis (assuming that the regulation at issue implicates the Second Amendment at all). In doing so, the Court has constructed a system of analysis that is arguably so malleable that it can be contorted to fit the policy preferences of any district judge in the country. It is, therefore, entirely predictable that litigants (like the government here) would seek

---

[2] I will note that even if Wright were able to relitigate the issues presented in his initial motion to dismiss, I am not persuaded that the possession of guns by convicted felons is activity protected by the text of the Second Amendment. The Supreme Court has never weighed in on the issue but has repeatedly suggested that to be the case. I say this simply to note that had this case been assigned to me all along, I would have held that felons are not people protected by the Second Amendment, such that an analysis of the second prong of the *Bruen* would have been unnecessary. *See, e.g., United States v. Garcia*, 2024 WL 1174045 (N.D. Ind. Mar. 19, 2024); *United States v. Tyner*, 2024 WL 517828 (N.D. Ind. Feb. 9, 2024); *United States v. Crawford*, 2023 WL 5559031 (N.D. Ind. Aug. 29, 2023); *United States v. Sutton*, 2023 WL 5559082 (N.D. Ind. Aug. 29, 2023); *United States v. Tribble*, 2023 WL 2455978 (N.D. Ind. Mar. 10, 2023).

to include more historical analogues than perhaps may be necessary to make their point – we are only in the early innings of *Bruen* analysis, and it is unforeseeable how a court will evaluate such analogues (let alone what level of generality controls the analysis).

*Rahimi*, the first of what is likely to be a series of clarifying precedents, reiterates that *Bruen* requires a "historical analogue"—but not a "dead ringer" or "historical twin"—for a modern gun regulation to pass constitutional muster. 144 S. Ct. at 1898, 1903. *Rahimi* emphasizes that one must determine whether a new law is "relevantly similar" to historical firearms regulations by "apply[ing] faithfully the balance struck by the founding generation to modern circumstances." *Id.* at 1893. Focusing on how a historical law is "relevantly similar" to modern regulation strikes me as ill defined to the point of tossing one's hands up and accepting inherent disharmony in the faithful application of the historical analysis *Bruen* requires. Consider for a moment the competing considerations driving this subjective inquiry, in the Court's own words:

> Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster." The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin."

*Rahimi*, 144 S. Ct. at 1898.

This block of text can be minced either way – to support a higher or lower level of generality in assessing the historical analogues presented. What that means, from a practical perspective, is that the government has an incentive to offer long-shot analogues to save modern regulations from Second Amendment challenges, like the obtuse slavery-era codes submitted to the court in this case. In all events, it strains credulity to suggest that there can be a due process or equal protection violation where the government is simply following the command of the Supreme Court to find historical analogues when defending present day firearm restrictions.

**ACCORDINGLY:**

For the reasons explained in this Opinion and Order, Defendant Fabian Wright's Second Amended Motion to Dismiss for Violation of Due Process [DE 53] is **DENIED**.

**SO ORDERED**.

ENTERED: August 22, 2024.

                                                  /s/ Philip P. Simon
                                                  PHILIP P. SIMON, JUDGE
                                                  UNITED STATES DISTRICT COURT